IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Magistrate Judge Marita Dominguez Braswell**

Civil Action No. 20–cv–01179–CNS–MDB

ANTHONY G. PIKE,

      Plaintiff,

v.

MATT LEWIS,
CORRECT CARE SOLUTIONS,
KURT HOLMES,
LORI MCLAUGHLIN,

      Defendants.

---

**REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE**

---

Before the Court are two motions to dismiss the Second Amended Complaint (["SAC" or "operative Complaint"]; Doc. No. 158.) Defendant Matt Lewis [Defendant Lewis], Sherriff of Mesa County at the time of the alleged incidents, filed a Motion to Dismiss the SAC (["Defendant Lewis Motion to Dismiss']; Doc. No. 160), to which Plaintiff has filed a Response (Doc. No. 171), and Defendant Lewis a Reply (Doc. No. 176.) Defendants Correct Care Solutions ["CCS" or "Defendant CCS"], CCS medical provider Kurt Holmes ["Defendant Holmes"], and CCS employee Lori McLaughlin ["Defendant McLaughlin"] [collectively "CCS Defendants"] have also filed a Motion to Dismiss the SAC (["CCS Defendants Motion to Dismiss"]; Doc. No. 161), to which Plaintiff has filed a Response (Doc. No. 169), and the CCS Defendants a Reply (Doc. No. 175.)

Also before the Court is Plaintiff's "Motion to explain reasons for 3rd amended complaint," (["Motion to Amend"] Doc. No. 186), which the Court construes as Plaintiff's renewed motion to amend the operative Complaint in this matter. Plaintiff also previously filed a "Motion for Third Amended Complaint," (["Proposed Third Amended Complaint" or "proposed amendment"]; Doc. No. 184), which is not actually a motion but rather a Proposed Third Amended Complaint. Both sets of Defendants have filed Responses to the Motion to Amend (Doc. Nos. 188, 189). Plaintiff has not replied to these Responses, and the time to do so has lapsed.

## SUMMARY FOR PRO SE PLAINTIFF

The Court has reviewed your Motion to Amend the Complaint as well as the Motions to Dismiss filed by Defendants and makes the following recommendations to the presiding District Court Judge.

First, the Court recommends the dismissal of your Motion to Amend. The Court finds your Proposed Third Amended Complaint "futile," which means that the allegations you wish to add would not survive a motion to dismiss.

Second, for the reasons explained in the analysis, the Court recommends dismissal of the following claims:

1.  Your individual capacity deliberate indifference claim against Matt Lewis.

2.  Your official capacity claim against Matt Lewis.

3.  Your deliberate indifference and medical negligence claims against Kurt Holmes.

4.  Your deliberate indifference and negligence claims against Lori McLaughlin as they relate to your hip pain and treatment.

5. Your municipal liability claim against Correct Care Solutions.

However, your official capacity claim against Matt Lewis, your municipal liability claim against Correct Care Solutions, and your medical negligence claim against Kurt Holmes are recommended to be dismissed *without* prejudice. This means that you would have the opportunity to refile these claims if you learn additional information that allows your claims to move past the motion to dismiss phase, or, in the case of the medical negligence claim, you comply with the "certificate of review" requirement described below.

Finally, the Court recommends denying the Motions to Dismiss and allowing you to proceed with these remaining claims:

1. Your deliberate indifference and negligence claims against Lori McLaughlin as they relate to your HIV medication.

2. Your vicarious liability claim against Correct Care Solutions.

These are only recommendations. The presiding District Court Judge will make the final decision regarding these motions. All parties can object to this Recommendation within fourteen days of recieving service of a copy of the Recommendation

## BACKGROUND

### I.     Allegations

In the operative Complaint, *pro se* Prisoner Plaintiff alleges that while being held as a pretrial detainee in Mesa County Detention Facility ["MCDF"], he suffered from multiple health ailments that went un- or under-addressed. (*See generally* Doc. No. 158.) Plaintiff asserts that each Defendant was culpable in some way for the allegedly constitutionally inadequate medical

attention he received during the relevant period, and now brings this suit alleging violations of his constitutional rights and negligence. (*Id.*)

According to the SAC, shortly after arriving at MCDF on May 16, 2018,[1] Plaintiff underwent a medical "screening process" with staff from Defendant CCS, a private company contracted to perform all internal medical care at MCDF.[2] (Doc. No. 158 at 8–9.) During the screening exam, Plaintiff informed the staff that he suffers from HIV and takes medication to control the virus. (*Id.* at 8.) Plaintiff was then asked to fill out a "release of information form … to get the names of the [HIV] meds [he took] so they [would] get ordered." (*Id.*) He was told by the examiners that his medications would be identified, ordered, and provided to him. (*Id.*) He was further told that Defendant McLaughlin, the Health Service Administrator at MCDF,[3] "is responsible to send that form out and to receive that info and get them ordered." (*Id.*) However, Defendant McLaughlin failed to procure Plaintiff's medication in the period immediately following the initial medical screening. (*Id.* at 9.)

---

[1] During all relevant periods, Defendant Lewis was the Mesa County Sheriff. (Doc. No. 158 at 3.)

[2] The Court construes Plaintiff as asserting that Defendant CCS was responsible for managing MCDF's "internal" medical operations.

[3] In this role, Defendant McLaughlin is "[r]esponsible for ensuring [the] provision of medical care at [MCDF]. (Doc No. 158 at 4.) Plaintiff appears to contend that Defendant McLaughlin is an employee of Defendant CCS. This is conceded by the CCS Defendants in their Motion to Dismiss. (Doc. No. 161 at 2.)

Shortly thereafter, Plaintiff began to suffer from "severe" hip pain. (*Id.* at 9.) On June 30, 2018, Plaintiff sent a "kite"[4] to MCDF's medical services, informing them of the pain he was having. (*Id.*) Plaintiff also used the same kite to ask about his HIV medication, which he still had not received. (*Id.*) Plaintiff received a response to his kite from Defendant McLaughlin. "This was the [second] time she was aware of [Plaintiff] wanting HIV medications and the first time [she was] aware of the severe pain [Plaintiff] was having" in his hip. (*Id.*) "This was 44 days with no meds or a visit to [their] office." (*Id.*) Plaintiff sent several kites about his hip pain to MCDF's medical services during the relevant period. (*Id.* at 15.)

On August 12, 2018, Plaintiff "went to medical for the first time" since arriving at MCDF. (*Id.* at 9.) During the appointment, Plaintiff discussed his hip pain and HIV diagnosis with "provider RD." (*Id.*) By this time, Plaintiff was struggling to walk. (*Id.* at 9–10.) He told "provider RD" that he still had not received his HIV medication even though he had provided MCDF with a "release of info form" to identify his medications. (*Id.* at 9.) "[P]rovider RD" "ordered labs and said he would get an appointment [with an] HIV provider outside [MCDF] and order an x-ray on [Plaintiff's] hip." (*Id.*) "At this point [Plaintiff had] been in jail 3 months [without] getting HIV meds and 43 days of many kits to medical over the severe pain [Plaintiff] was having, not being able to walk." (*Id.*) Defendant McLaughlin "knew of my issues and made the appointments and x-ray on [my] hip." (*Id.*)

On August 15, 2018, Plaintiff had the x-ray conducted on his hip. (*Id.* at 10.) Later the same day, Plaintiff's hip "locked up," requiring wheelchair assistance to transport him to

---

[4] A kite is an internal prison communication used by prisoners to make a request or ask a question.

MCDF's medical facility. (*Id.*) Plaintiff was seen by Defendant Holmes at the MCDF medical facility. Defendant Holmes is a doctor and was Medical Director at MCDF.[5] (*Id.* at 3.) Defendant Holmes reviewed the x-ray of Plaintiff's hip and told him it was "bone on bone." (*Id.* at 10.) Defendant Holmes suggested that Plaintiff could receive an injection to help with the pain but wanted to seek a second opinion because HIV compromises the immune system. (*Id.*) Defendant Holmes also said he would refer Plaintiff to an orthopedic surgeon for further analysis of his hip. (*Id.*) Plaintiff never received a second opinion regarding an injection for his hip pain and never had an appointment scheduled with an orthopedic surgeon. (*Id.*)

On August 20, 2018, Plaintiff saw "Dr. Davis," an outside medical provider, regarding his HIV. (*Id.* at 12.) Plaintiff told Dr. Davis that he was yet to receive any HIV medication from MCDF. (*Id.*) By this time, Plaintiff's T-cell count had dropped from over 500 to 283—a number considered "very low"—and he had a detectable viral load in his system.[6] (*Id.* at 13–14, 18.) Plaintiff told Dr. Davis that his family had previously attempted to bring the medication to him but was turned away by prison employees. (*Id.* at 12.) The deputy accompanying Plaintiff to the appointment said this should not have happened, and Plaintiff said he would have them try again. (*Id.*) "Dr. Davis said she would call the jail and see if [Plaintiff's family brought his HIV

[5] In this role, Defendant Holmes is "[r]esponsible for [the] overall management [of the MCDF medical system, as well as] treatment and evaluations." (Doc. No. 158 at 3.) Plaintiff appears to contend that Dr. Holmes was affiliated with Defendant CCS. This appears conceded by Defendant Holmes as he is labeled a "CCS Defendant" in their Motion to Dismiss. (Doc. No. 161 at 1.)

[6] When Plaintiff eventually bonded out to seek an opinion on his hip from Rocky Mountain Orthopedic, he was told that they could not perform surgery on him because his T-cell count was too low. (Doc. No 158 ¶ 18.)

medication] in a few days." (*Id.*) However, when Plaintiff's family subsequently tried to bring

him his medication, they were again turned away by the prison employees. (*Id.*) On August 27,

2018, Plaintiff received a kite saying that Dr. Davis had called to ask whether Plaintiff had

received his medication or whether he needed her to write a prescription. (*Id.*) Plaintiff submitted

a kite in response, saying that he had not received his HIV medication and needed a prescription.

(*Id.*) However, Dr. Davis never received Plaintiff's response from MCDF, as Defendant

McLaughlin "never got back [in contact] with Dr. Davis," after receiving Plaintiff's kite. (*Id.* at

16.) Plaintiff did not learn this until October 16, 2018. (*Id.*)

On August 29, 2018, Plaintiff "submitted a kite to see when [he] was going to the

orthopedic surgeon" for his hip condition. (*Id.* at 10.) The MCDF medical department responded

that any "offsite appointments go through an approval [process] with insurance," and that the

insurance company was requesting more information from Defendant Holmes before the

appointment could be scheduled. (*Id.*) Plaintiff was told "[t]o please be patient and [he would] be

notified." Plaintiff subsequently filed a grievance regarding his hip pain and the lack of care he

had received.[7] (*Id.* at 13.) Defendant McLaughlin later responded to Plaintiff's grievance, saying

that on September 12, 2018, Dr. Holmes had re-reviewed Plaintiff's x-rays and determined that

Plaintiff "did not need to see an orthopedic surgeon" because the condition was not "emergent."[8]

_____

[7] In the grievance, Plaintiff reported his experience with medical care as an inmate, making many of the same allegations he makes in the operative Complaint. (Doc. No. 158 ¶ 14.) In response, Defendant McLaughlin alleged that Defendant was choosing not to take his HIV medication, had declined a new prescription, and had a history of being non-compliant with his medication. (*Id.*) Plaintiff denies this allegation and claims to have over 30 kites addressing his hip pain and HIV medication.

[8] In the SAC, Plaintiff states that he also filed a new kite about his still "severe" hip pain on September 15, 2018, and that in a response to that kite, Defendant McLaughlin said an

(*Id.* at 19.) Defendant Holmes informed the insurance company that an orthopedic appointment was not necessary. (*Id.* at 11–12.) During this period, Plaintiff struggled to walk, sleep, and get dressed. (*Id.*)

On October 16, 2018, after submitting kites complaining about HIV-related sores on his body, Plaintiff attended another outside appointment with Dr. Davis regarding his HIV. (*Id.* at 12, 18.) This appointment was when Plaintiff learned that Dr. Davis "never got an answer back about her ordering HIV medications." (*Id.*) After the appointment, Dr. Davis contacted MCDF's medical department, and Plaintiff was summoned to pick up his HIV medication the following day. (*Id.* at 13.) However, at that time, MCDF had only procured two of the three medications Plaintiff takes for HIV. (*Id.*) Plaintiff declined to take the two medications with him because the medication cocktail only provides effective treatment when all three are taken together. (*Id.* at 13.) On October 24, 2018, Plaintiff submitted a new kite asking the medical department to contact Dr. Davis about the third medication. (*Id.*) Plaintiff submitted several kites on this issue between October 16 and November 7, 2018.[9] (*Id.*) MCDF finally obtained the third medication by November 8, 2022. (*Id.*) Plaintiff subsequently began taking his HIV medications. (*Id.*)

Plaintiff asserts several claims in connection with his factual allegations. First, he claims that Defendants McLaughlin and Holmes violated his Fourteenth Amendment rights in their

---

appointment was still "pending." (*Id.* at 11.) Plaintiff may be contending that there is an allegedly suspicious mismatch between Defendant McLaughlin's response to his kite and her (apparently) later response to his grievance which said that the determination that an appointment was unnecessary happened on September 12, 2018. However, the SAC does not expand on this point other than vaguely noting it. (*Id.*)

[9] This included one kite sent directly to Defendant Lewis seeking approval to do an interview with a local television station that had been reporting on medical care issues in MCDF. (Doc. No. 158 at 10).

individual capacities by acting deliberately indifferent to his need for HIV medication and treatment for severe hip pain under 42 U.S.C. § 1983. (*Id.* at 18–19.) Plaintiff also makes a municipal liability claim under *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978), against Defendant CCS in connection with the actions of its employee, Defendant McLaughlin, and its affiliated doctor, Defendant Holmes, who are also sued in their official capacities. (*Id.* at 19–20.) Additionally, Plaintiff makes a deliberate indifference claim against Defendant Lewis as an individual and a connected municipal liability claim by also suing Defendant Lewis in his official capacity as sheriff of MCDF. (*Id.* at 3); *see Hafer v. Melo*, 502 U.S. 21, 25 (1991) ("Suits against [governmental] officials in their official capacity therefore should be treated as suits against the [government entity]".). Finally, though not explicitly stated in the operative Complaint, the Court construes Plaintiff's allegations as asserting a negligence claim against Defendants McLaughlin and Holmes, which is also brought vicariously against Defendant CCS.[10] *See Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991) (saying that a court should adjust for a *pro se* plaintiff's "unfamiliarity with pleading requirements").

## II.   Procedural History

Plaintiff initiated this action by filing a Complaint on April 27, 2020. (Doc. No. 1.) At the direction of the Honorable Gordon Gallagher, Plaintiff filed an Amended Complaint on July 21, 2020, clarifying his claims and complying with Local Rule 5.1(c) regarding the filing of *pro se* prisoner complaints. (Doc. Nos. 7, 10.) On March 12, 2021, Plaintiff moved to file a Second Amended Complaint. (Doc. No. 110.) The Honorable Kathleen Tafoya granted his motion. (Doc.

---

[10] In their Motion to Dismiss (Doc. No. 161), the CCS Defendants construed Plaintiff's claims as such. Plaintiff does not appear to contest this construction in his Response to the CCS Defendants. (Doc. No. 169.)

No. 157.) The parties then agreed to a May 13, 2021, deadline to make additional amendments to the pleadings. (Doc. No. 113.) This deadline was later extended to June 15, 2021. (Doc. No. 130.) Defendants filed the instant motions to dismiss on September 9, 2021. (Doc. Nos. 160, 161.)

On November 15, 2021, Plaintiff moved to file a Third Amended Complaint. (Doc. No. 178.) Before Judge Tafoya could rule on the motion, Plaintiff filed the Proposed Third Amended Complaint. (Doc. No. 182.) On January 10, 2022, Judge Tafoya denied Plaintiff's motion to file a Third Amended Complaint without prejudice. (Doc. No. 184.) Judge Tafoya wrote that Plaintiff had "failed to explain" why his motion to amend the complaint for the third time had come six months after the May 13, 2021, deadline. (*Id.*) On February 17, 2022, Plaintiff filed his "Motion to explain reasons for 3rd amended complaint," which the Court construes as a renewed Motion to Amend the Complaint.[11] (Doc. No. 186.)

## III.   Motion to Amend and Proposed Amendment

In Plaintiff's renewed Motion to Amend, he provides three reasons why he should be allowed to file a Third Amended Complaint. (*Id.*) First, Plaintiff says he has "information on policies that [he] did not have when [he] filed his 1st and 2nd amended complaint[s] that pertain to what happened to [him] in receiving medical treatment." (*Id.* at 2.) Second, Plaintiff indicates that he "want[s] to share" information with the Court regarding allegations against the CCS Defendants in other cases. (*Id.*) And third, Plaintiff asks the Court for leniency when considering

---

[11] The Court further construes the Proposed Third Amended Complaint (Doc. No. 182), filed in connection with Plaintiff's previous motion to amend, as the operative proposed amendment. (*See* Doc. No. 186 ("I'm asking the [C]ourt to review and accept my 3rd amended complaint that I had filed on 1-6-2022.").)

the Motion to Amend in light of his pro se status and "lack of access to [the] prison law library" due to Covid-19 restrictions. (*Id.*)

In the Proposed Third Amended Complaint, Plaintiff seeks to add the following allegations. First, as to Defendant CCS, Plaintiff solidifies what is alleged, but somewhat hazy in the Second Amended Complaint: "[Defendant CCS] controls all aspects of healthcare available to inmates in Mesa County Jail …." [12] (Doc. No. 182 at 3.) Plaintiff alleges that in this role, Defendant CCS has "continuously [and knowingly] tolerated substandard care," specifically alleging that the company has a policy or widespread custom of "(1) understocking or not timely securing inmates [*sic*] necessary prescription medications [and,] (2) [a] widespread custom of disregarding or ignoring serious medical needs and conditions." (*Id.* at 2–3.) Plaintiff further alleges that he "can show that delay and denial of my medical care[,] especially in relation to HIV[,] has been a persistent pattern as there has been notices that have ben given by grievances and medial request[s] to CCS['s] medical department." (*Id.*)

Second, the Proposed Third Amended Complaint adds allegations against Defendant Lewis in his individual and official capacities. Specifically, regarding Plaintiff's medical situation, the Proposed Third Amended Complaint alleges that "[Defendant Lewis] was on notice of what was going on with [Plaintiff's health concerns] and never spoke to [Plaintiff] over [his] situation or tr[ied] to remedy the wrong that was going on in his jail." (*Id.* at 4.) The Proposed Third Amended Complaint goes on to allege that Defendant Lewis assumed "[u]ltimate

---

[12] Plaintiff expands on this allegation, saying, "CCS contracts with and acts as an agent or representative of Mesa County in order to provide all medical health services at Mesa County Jail and to help and develop and administer the policies related to onsite or offsite medical care that may be provided to detainees and prisoners." (Doc. No. 182 at 3.)

responsibility for the establishment and enforcement of the sheriffs [*sic*] department policies concerning the treatment of inmates … and training of subordinates … [and] monitored all issues related to inmates [*sic*] grievances … the performance of CCS personnel at the jail, the outside [of jail] medical needs of inmates, and budgetary and cost considerations of jail expenditures related to medical care." (*Id.* at 12.) The proposed amendment concludes that Defendant Lewis "adopted or authorized policies and customs, that unlawfully denied [Plaintiff] and other similarly situated inmates at [MCDF] medical care …." (*Id.* at 13.)

## LEGAL STANDARD

## I.      Federal Rule of Civil Procedure 12(b)(6)

Federal Rule of Civil Procedure 12(b)(6) provides that a defendant may move to dismiss a claim for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted." *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1201 (10th Cir. 2003) (quotation marks omitted).

"A court reviewing the sufficiency of a complaint presumes all of plaintiff's factual allegations are true and construes them in the light most favorable to the plaintiff." *Hall v. Bellmon*, 935 F.2d 1106, 1109 (10th Cir. 1991). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Plausibility, in the context of a Rule 12(b)(6) motion to dismiss, means that the plaintiff pleaded facts that allow "the court to draw the reasonable inference that

the defendant is liable for the misconduct alleged." *Id*. The *Iqbal* evaluation requires two prongs

of analysis. First, the court identifies "the allegations in the complaint that are not entitled to the

assumption of truth," *i.e.,* those allegations which are legal conclusions, bare assertions, or

merely conclusory. *Id*. at 679–81. Second, the court considers the factual allegations "to

determine if they plausibly suggest an entitlement to relief." *Id*. at 681. If the allegations state a

plausible claim for relief, the claim survives the motion to dismiss. *Id*. at 679.

That being said, the Court need not accept conclusory allegations without supporting

factual averments. *S. Disposal, Inc., v. Tex. Waste*, 161 F.3d 1259, 1262 (10th Cir. 1998). "[T]he

tenet that a court must accept as true all of the allegations contained in a complaint is

inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action,

supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S at 678. Moreover, "[a]

pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause

of action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of

'further factual enhancement.'" *Id.* (citation omitted). "Where a complaint pleads facts that are

'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and

plausibility of 'entitlement to relief.'" *Id.* (citation omitted).

## II.   Leave to Amend Complaint

When a motion to amend a complaint is filed after the deadline set in a scheduling order,

the Court must engage in a two-step analysis to determine whether the proposed amendment is

proper under Federal Rule of Civil Procedure Rules 16(b) and 15(a). "After a scheduling order

deadline, a party seeking leave to amend must demonstrate (1) good cause for seeking

modification under Federal Rule of Civil Procedure 16(b)(4) and (2) satisfaction of the Federal

Rule of Civil Procedure Rule 15(a) standard." G*orsuch, Ltd., B.C. v. Wells Fargo Nat'l Bank Ass'n*, 771 F.3d 1230, 1241 (10th Cir. 2014) ("We now hold that parties seeking to amend their complaints after a scheduling order deadline must establish good cause for doing so.").

> Rule 16(b)[(4)]'s good cause standard is much different than the more lenient standard contained in Rule 15(a). Rule 16(b)[(4)] does not focus on the bad faith of the movant, or the prejudice to the opposing party. Rather, it focuses on the diligence of the party seeking leave to modify the scheduling order to permit the proposed amendment. Properly construed, good cause means that the scheduling deadlines cannot be met despite a party's diligent efforts. In other words, the Court may "modify the schedule on a showing of good cause if [the deadline] cannot be met despite the diligence of the party seeking the extension."

*Pumpco, Inc. v. Schenker Int'l Inc.*, 204 F.R.D. 667, 668 (D. Colo. 2001) (citations omitted). Notably, however, "rigid adherence to the pretrial scheduling order is not advisable." *Sil-Flo, Inc. v. SHFC, Inc.*, 917 F.2d 1507, 1519 (10th Cir. 1990).

If a plaintiff demonstrates good cause under Rule 16(b)(4), a court then moves to the second step of the analysis and reviews whether the plaintiff has satisfied the requirements of Rule 15(a). *Nicastle v. Adams Cty. Sheriff's Office*, No. 10-cv-00816-REB-KMT, 2011 WL 1465586, at *3 (D. Colo. Mar. 14, 2011). Under Federal Rule of Civil Procedure 15(a)(2), the court is to freely allow amendment of the pleadings "when justice so requires." The grant or denial of an opportunity to amend is within the discretion of the court, but "outright refusal to grant the leave without any justifying reason appearing for the denial is not an exercise of discretion; it is merely abuse of that discretion and inconsistent with the spirit of the Federal Rules." *Foman v. Davis*, 371 U.S. 178, 182 (1962). "Refusing leave to amend is generally only justified upon a showing of undue delay, undue prejudice to the opposing party, bad faith or dilatory motive, failure to cure deficiencies by amendments previously allowed, or futility of amendment." *Frank v. U.S. West, Inc.*, 3 F.3d 1357, 1365 (10th Cir. 1993). "[T]he liberal

standard for granting of motions for leave to amend unless the amendment inflicts undue

prejudice on the non-moving party reflects the Court's underlying policy that pleadings should

enable a claim to be heard on its merits." *James et al. v. Fenske*, No. 10-cv-02591-WJM-CBS,

2012 WL 592855 at *3 (D. Colo. Feb. 23, 2012) (citing *Calderon v. Kan. Dep't of Soc. &

Rehabilitative Servs.*, 181 F.3d 1180, 1186 (10th Cir. 1999)).

Undue prejudice to a defendant is the most important factor in considering whether a

plaintiff should be permitted to amend his complaint pursuant to Rule 15. *Minter v. Prime Equip.

Co.*, 451 F.3d 1196, 1207 (10th Cir. 2006). "Courts typically find prejudice only when the

amendment unfairly affects the defendants in terms of preparing their defense." *Id.* (internal

quotation omitted). "Most often, this occurs when the amended claims arise out of a subject

matter different from what was set forth in the complaint and raise significant new factual

issues." *Id.* at 1208 (citations omitted).

## III.     *Pro Se* **Plaintiff**

Plaintiff is proceeding *pro se*. The court, therefore, "review[s] his pleadings and other

papers liberally and hold[s] them to a less stringent standard than those drafted by attorneys."

*Trackwell v. United States*, 472 F.3d 1242, 1243 (10th Cir. 2007) (citations omitted); *see Haines

v. Kerner*, 404 U.S. 519, 520–21 (1972) (holding the allegations of a *pro se* complaint "to less

stringent standards than formal pleadings drafted by lawyers"). However, a *pro se* litigant's

"conclusory allegations without supporting factual averments are insufficient to state a claim

upon which relief can be based." *Hall v. Bellmon,* 935 F.2d 1106, 1110 (10th Cir. 1991). A court

may not assume that a plaintiff can prove facts that have not been alleged or that a defendant has

violated laws in ways that a plaintiff has not alleged. *Associated Gen. Contractors of Cal., Inc. v.*

*Cal. State Council of Carpenters*, 459 U.S. 519, 526 (1983); *see Whitney v. New Mexico*, 113 F.3d 1170, 1173–74 (10th Cir. 1997) (stating that a court may not "supply additional factual allegations to round out a plaintiff's complaint"); *Drake v. City of Fort Collins*, 927 F.2d 1156, 1159 (10th Cir. 1991) (the court may not "construct arguments or theories for the plaintiff in the absence of any discussion of those issues"). The plaintiff's *pro se* status does not entitle him to an application of different rules. *Montoya v. Chao*, 296 F.3d 952, 957 (10th Cir. 2002).

## ANALYSIS

### I.   Leave to Amend the Complaint

#### a.   *Good Cause Pursuant to Rule 16(b)(4)*

Because Plaintiff filed the instant Motion to Amend subsequent to the June 15, 2021, deadline set out in the Scheduling Order (Doc. No. 130), before addressing whether leave to amend should be granted under Rule 15, the Court first must review whether Plaintiff has shown good cause for the amendment pursuant to Rule 16(b)(4). G*orsuch, Ltd., B.C. v. Wells Fargo Nat'l Bank Ass'n*, 771 F.3d 1230, 1241 (10th Cir. 2014) ("[P]arties seeking to amend their complaints after a scheduling order deadline must establish good cause for doing so.").

The good cause analysis is focused on "the diligence of the party seeking leave to modify the scheduling order to permit the proposed amendment." *Pumpco, Inc.*, 204 F.R.D. at 668. Plaintiff must "show that [he] was diligent in attempting to meet the deadline, which means [he] must provide an adequate explanation for any delay." *Minter*, 451 F.3d at 1205 n.4. "The fact that a party first learns, through discovery or disclosures, information necessary for the assertion of a claim after the deadline to amend established in the scheduling order has expired constitutes good cause to extend that deadline." *Pumpco, Inc.*, 204 F.R.D. at 668–69. However, "[i]f the

plaintiff knew of the underlying conduct but simply failed to raise [new claims or allegations]," good cause is not established. *Gorsuch, Ltd.*, 771 F.3d at 1240.

Plaintiff's Proposed Third Amended Complaint raises a number of new allegations against Defendant CCS and Defendant Lewis. (*See supra* at 10–12.) In support of good cause for the untimely amendment, Plaintiff asserts that subsequent to filing the operative Complaint, he learned new information on "policies" relevant to his claim.[13] (Doc. No. 186 at 2.) These policies are ostensibly those of Defendant CCS and of MCDF. Plaintiff further asks the Court for leniency, considering his "lack of access to [the] prison law library [due] to [Covid-19] lockdowns and restrictions over the last 18 months." (*Id.*)

After review, the Court finds good cause for Plaintiff's amendment. Under the circumstances, Plaintiff has been reasonably diligent in prosecuting his claims and seeking this amendment. While apparently not learned through formal discovery,[14] Plaintiff learned new information relevant to his claims since the deadline to amend passed. The Court has not been presented reason to believe that Plaintiff was aware of the information when his Second Amended Complaint was filed and chose to sit on it. Further, Plaintiff's *pro se* status and understandably limited access to the prison law library add support to a finding of good cause in this instance. *See Hurst v. Madera*, No. 16-cv-01914-KMT, slip op. at 2–3 (D. Colo. July 20, 2021) (finding good cause for an untimely amendment when the plaintiffs demonstrated that the relevant information was unknown to them prior to the scheduling order deadline and that they

---

[13] While Plaintiff does not explicitly state it, his Motion implies that this information was learned subsequent to the deadline to amend.

[14] Plaintiff's Proposed Third Amended Complaint indicates that Plaintiff learned new information with the help of his family. (Doc. No. 182.)

were diligent in uncovering the information); *United States v. Harrington*, No. 19-cv-02965-PAB-GPG, slip op. at 4–5 (D. Colo. Oct. 28, 2021) (finding the same); *A.N. v. Neugebauer*, No. 20-cv-00904-RBJ (D. Colo. Nov. 30, 2020) (finding the same).

### b. *Rule 15(a)*

With good cause shown pursuant to Rule 16(b)(4), the Court next considers whether the proposed amendment complies with Rule 15(a). Broadly, when reviewing a proposed amendment under Rule 15(a), the Court asks, "whether justice would be served by amendment." *Myers v. City of Loveland, Colo.*, 2013 WL 3381276, at *5 (D. Colo. July 8, 2013); *see Minter*, 451 F.3d, 1204 ("[Rule 15(a)] itself states that 'leave shall be freely given when justice so requires.' The purpose of the Rule is to provide litigants 'the maximum opportunity for each claim to be decided on its merits rather than on procedural niceties.'" (quoting Fed.R.Civ.P. 15(a); *Hardin v. Manitowoc–Forsythe Corp.*, 691 F.2d 449, 456 (10th Cir.1982))). "In situations where the request falls outside of the pleading amendment deadline and good cause is shown, leave should generally be permitted unless the moving party unduly delayed or failed to cure, the opposing party would be unduly prejudiced, or the proposed amendment would be futile." *Id.* (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

<u>Undue Delay</u>

The Court may deny a motion to amend based on undue delay. *Minter*, 451 F.3d at 1205. "The important inquiry is not simply whether Plaintiff has delayed, but whether such delay is undue." *Id.* at 1206. The Tenth Circuit "focuses primarily on the reason for the delay." *Id.* "A motion to amend is untimely if, among other reasons, the moving party has made the complaint a 'moving target,' is trying to 'salvage a lost case by untimely suggesting new theories of

recovery,' is trying to present more theories to avoid dismissal, or is knowingly waiting until the eve of trial to assert new claims." *Myers*, 2013 WL 3381276, at *5 (quoting *Minter*, 451 F.3d at 1206). A court may also find undue delay when there is a "lack of adequate explanation for the delay or when a moving party knows or should have known of the facts in the proposed amendment but did not include them in the original complaint or any prior attempts to amend." *Id.* (citing *Minter*, 451 F.3d at 1206).

At the outset, the Court acknowledges that a substantial period of time has passed between Plaintiff's original complaint and his instant attempt to amend.[15] However, "[l]ateness does not of itself justify the denial of the amendment." *R.E.B., Inc. v. Ralston Purina Co.*, 525 F.2d 749, 751 (10th Cir.1975). The Court must look deeper, to the reasons for the delay. *Myers*, 2013 WL 3381276, at *6 ("When a [p]laintiff provides an adequate explanation for the delay, leave to amend should not be denied on this basis.").

As noted in the good cause analysis, Plaintiff blames the delay on his inability to learn the information within the timeframe provided by the scheduling order. (Doc. No. 186 at 2; Doc. No. 130.) Plaintiff says his inability to timely amend was because he had to rely, in part, on his family's research and communications to obtain the new information due to heavily restricted prison library access under Covid-19 protocols. (Doc. No. 186 at 2.) In light of Plaintiff's *pro se* status and the unusual roadblocks created by Covid-19, the Court finds his explanation reasonable. *See Hall v. Bellmon*, 935 F.2d 1106, 1114 n.3 (10th Cir. 1991) ("[P]ro se litigants are

---

[15] As Judge Tafoya noted in her previous denial without prejudice, Plaintiff's initial motion to amend his complaint for the third time came eighteen months after filing the original complaint. (Doc. No. 184.)

to be given reasonable opportunity to remedy the defects in their pleadings.") Further, because Plaintiff doesn't seek to add new claims or parties, there is little indication that he is acting to create a "moving target complaint" or to otherwise salvage a clearly lost case. *Myers*, 2013 WL 3381276, at *5. And finally, although the case was not new, it is still only at the motion to dismiss stage and nowhere close to the "eve of trial," giving Defendants ample time to contend with the additional allegations. *Id.* For these reasons, the Court does not believe Plaintiff has unduly delayed this proposed amendment such that it must be denied.

Undue Prejudice

Prejudice to the nonmoving party is the "most important" factor in considering whether amendment should be permitted. *Minter*, 451 F.3d at 1207 (citations omitted). However, the Court will not find prejudice merely because an amendment would create additional work for the opposing party. Whether prejudice exists is ultimately a question of fairness. *Minter*, 451 F.3d at 1208 ("Courts typically find prejudice only when the amendment unfairly affects the defendants 'in terms of preparing their defense to the amendment.'" (quoting *Patton v. Guyer*, 443 F.2d 79, 86 (10th Cir. 1971)). Usually, a proposed amendment is found prejudicial when the amended claims or allegations "arise out of a subject matter different from what was set forth in the complaint and raise significant new factual issues." *Id.*

The Court is not persuaded by Defendants' prejudice arguments. Plaintiff does not assert any new claims in the proposed amendment. Instead, Plaintiff seeks to add additional factual allegations related to claims already established in the Second Amended Complaint—namely, the municipal liability claims against Defendant CCS and against Mesa County. (*See generally* Doc. No. 182.) These new allegations arise from the same subject matter as the claims previously

asserted and do not "substantially change[] the theory on which the case has been proceeding." 6 Wright, Miller & Kane, *Federal Practice and Procedure* § 1487 (3d ed. 2022); *see Childers v. Indep. Sch. Dist. No. 1*, 676 F.2d 1338, 1343 (10th Cir. 1982) (ruling that the district court's refusal to allow an amendment was "particularly egregious in this case because the subject matter of the amendment was already alleged in the complaint"); *R.E.B., Inc.*, 525 F.2d at 751–52 (finding no prejudice when "[t]he amendments did not propose substantially different issues"). Further, because discovery has been stayed in this matter since August 10, 2021 (Doc. No. 151), duplicative or otherwise burdensome discovery in light of the amendment is of minimal concern. *See Morse v. McWhorter*, 290 F.3d 795 (6th Cir. 2002) (taking into account a stay of discovery when finding insufficient prejudice to deny a motion to amend); *see also May v. Santini*, 2016 WL 226610, at *6 (D. Colo. Jan. 19, 2016) ("Defendants are, at most, only minimally prejudiced [by a grant of leave to amend] given the court's stay [of discovery].")

In short, the Court believes that any prejudice to Defendants caused by the proposed amendment will be minimal and does not rise to a level requiring denial of the Motion to Amend.

Futility[16]

"Although Fed.R.Civ.P. 15(a) provides that leave to amend shall be given freely, the district court may deny leave to amend where amendment would be futile. A proposed amendment is futile if the complaint, as amended, would be subject to dismissal." *Jefferson Cnty. Sch. Dist. No. R–1 v. Moody's Investor Servs., Inc.*, 175 F.3d 848, 859 (10th Cir. 1999); *see also Hall v. Bellmon*, 935 F.2d 1106, 1109–10 (10th Cir. 1991) ("Although dismissals under Rule

---

[16] Because the review of the Proposed Third Amended Complaint for futility utilizes the same standard as the review of the Motions to Dismiss, the Court will also address the status of the Motions to Dismiss as to the claims affected by the proposed amendments in this section.

12(b)(6) typically follow a motion to dismiss ..., a court may dismiss sua sponte when it is patently obvious that the plaintiff could not prevail on the facts alleged, and allowing him an opportunity to amend his complaint would be futile." (citations omitted)) "In ascertaining whether plaintiff['s] proposed amended complaint is likely to survive a motion to dismiss, the court must construe the complaint in the light most favorable to plaintiff[ ], and the allegations in the complaint must be accepted as true." *Bennett v. Wells Fargo Home Mortg.*, No. 16-cv-03185-CMA-KLM, 2017 WL 4675524, at *1 (D. Colo. Oct. 18, 2017). "Any ambiguities must be resolved in favor of plaintiff[ ], giving [plaintiff] 'the benefit of every reasonable inference' drawn from the 'well-pleaded' facts and allegations in [the] complaint." *Id.*

In reviewing the Proposed Third Amended Complaint, the Court has identified three claims affected by Plaintiff's desired amendments: the deliberate indifference claim against Defendant Lewis in his *individual* capacity, the deliberate indifference claim against him in his *official* capacity, and the municipal liability claim against Defendant CCS. Accordingly, the Court will consider the proposed amendments for futility in turn.

### i. *Defendant Lewis in His Individual Capacity*

In the SAC, the only allegation connecting Defendant Lewis, personally, to the relevant events is the assertion that Plaintiff sent a kite to Defendant Lewis, seeking permission to do an interview at the jail with a local television news channel that was reporting on issues with medical treatment at MCDF. (Doc. No. 158 at 10.) In the Proposed Third Amended Complaint, Plaintiff adds the conclusory claim that "[Defendant Lewis] was on notice of what was going on with [Plaintiff's health concerns] and never spoke to [Plaintiff] over [his] situation or tr[ied] to remedy the wrong that was going on in his jail." (Doc. No. 182 at 4.) The proposed amendment

also adds allegations related to Defendant Lewis' leadership role at MCDF. Specifically, Plaintiff alleges that Defendant Lewis assumed "[u]ltimate responsibility for the establishment and enforcement of the sheriffs [*sic*] department policies concerning the treatment of inmates … and training of subordinates … [and] monitored all issues related to inmates [*sic*] grievances … the performance of CCS personnel at the jail, the outside [of jail] medical needs of inmates, and budgetary and cost considerations of jail expenditures related to medical care." (*Id.* at 12.) The Proposed Third Amended Complaint concludes that Defendant Lewis "adopted or authorized policies and customs, that unlawfully denied [Plaintiff] and other similarly situation inmates at [MCDF] medical care …." (*Id.* at 13.) On the basis of these allegations, Plaintiff alleges Defendant Lewis was deliberately indifferent to his serious medical conditions.

Plaintiff's allegations can be categorized as "supervisory liability" claims against Defendant Lewis. *Cano v. Denning*, 2013 WL 322112, at *7 (D. Kan. Jan. 28, 2013) ("Under Section 1983, a defendant sued in an individual capacity may be subject to personal liability and/or supervisory liability.") (quoting *Brown v. Montoya*, 662 F.3d 1152, 1163 (10th Cir. 2011). "To establish supervisory liability, plaintiffs must establish that (1) defendant promulgated, created, implemented or possessed responsibility for the continued operation of a policy, (2) the policy caused the alleged constitutional harm and (3) defendant acted with the state of mind required to establish the alleged constitutional deprivation." *Cano*, 2013 WL 322112, at *7 (citing *Dodds v. Richardson*, 614 F.3d 1185, 1199 (10th Cir. 2010)). Section 1983 does not recognize a concept of strict supervisor liability. *Fogarty v. Gallegos*, 523 F.3d 1147, 1162 (10th Cir. 2008). There must be an "affirmative link … between the constitutional deprivation and either the supervisor's personal participation, his exercise of control or direction, or his failure to

supervise." *Gallagher v. Shelton*, 587 F.3d 1063, 1069 (10th Cir. 2009). Thus, even when

alleging supervisory liability, a plaintiff must show some form of "personal involvement" by a

defendant in the alleged constitutional violation. *Foote v. Spiegel*, 118 F.3d 1416, 1423 (10th Cir.

1997).

Here, though Plaintiff makes multiple claims as to Defendant Lewis' role in overseeing

MCDF, training subordinates, and promulgating and enforcing policy, Plaintiff makes no

allegation of any specific policy promulgated, enforced, or maintained by Defendant Lewis, nor

does he allege any specific instance where Defendant Lewis failed to supervise his subordinates

properly. In other words, Plaintiff's allegations fail to affirmatively link Defendant Lewis's

supervision to the alleged constitutional violations. Additionally, nothing put forward by Plaintiff

supports Defendant Lewis personally directing the alleged violations, and indeed Plaintiff admits

that Defendant Lewis "never spoke to [Plaintiff] over [his] situation[.]" (Doc. No. 182 at 4.) And

outside of the conclusory allegation that he was "on notice," Plaintiff has not alleged facts to

establish that Defendant Lewis knew of and acquiesced to the alleged violations. Instead,

Plaintiff's allegations generally boil down to the claim that because Defendant Lewis was "in

charge," he was personally liable for everything that happened at MCDF. However, that is not

sufficient to establish liability under § 1983. *See Woodward v. City of Worland*, 977 F.2d 1392,

1399 (10th Cir. 1992) ("[I]t is not enough for a plaintiff merely to show a defendant was in

charge of other state actors who actually committed the violation."); *Perry v. Durborow*, 892 F3d

1116, 1121 (10th Cir. 2018) ("[Section 1983 does not] authorize liability under a theory of

respondeat superior."). Other Courts have dismissed similar claims in similar circumstances. *See*

*Cano*, 2013 WL 322112, at *7 (dismissing a claim predicated on supervisory liability which

failed to "allege any *specific* policy which caused an alleged underlying constitutional violation")
(emphasis in original); *Moya v. Garcia*, 2017 WL 4536080 (D.N.M. Feb. 13, 2017) (dismissing
claims against multiple wardens and sheriffs because the plaintiffs did not allege a constitutional
deprivation "based on a policy promulgated by Individual Defendants"); *see also Woodward*,
977 F.2d at 1399 ("Supervisor liability requires 'allegations of personal direction or of actual
knowledge and acquiescence.'" (quoting *Andrews v. City of Philadelphia*, 895 F.2d 169, 1478
(3rd. Cir. 1990))).

Accordingly, because Plaintiff's allegations, as amended by the Proposed Third Amended
Complaint, do not assert that Defendant Lewis was affirmatively linked—either via his personal
acts or his role as an MCDF supervisor—to the alleged constitutional violations, the Court need
not conduct a deliberate indifference analysis in relation to this claim. Plaintiff's claim against
Defendant Lewis fails as a matter of law, and the proposed amendment would be futile.
Therefore, the Court recommends that Plaintiff's Motion to Amend (Doc. No. 186) be denied
and Defendant Lewis's Motion to Dismiss (Doc. No. 160) be granted as it relates to this claim.

### ii.   *Mesa County/Defendant Lewis in His Official Capacity*

Plaintiff also sues Defendant Lewis in his official capacity. (Doc. No. 158 at 3.) "A claim
against a state actor in his official capacity 'is essentially another way of pleading an action
against the county or municipality' and is considered under the standard applicable to Section
1983 claims against municipalities or counties." *Cano*, 2013 WL 322112, at *5 (quoting *Porro v.
Barnes*, 624 F.3d 1322, 1328 (10th Cir. 2010)); *see Hafer v. Melo*, 502 U.S. 21, 25 (1991)
("Because the real party in interest in an official-capacity suit is the governmental entity and not
the named official, the entity's policy or custom must have played a part in the violation of

federal law." (internal quotation marks omitted)) Under *Monell v. Dept. of Soc. Servs. Of City of N.Y.*, a plaintiff who brings claims against a municipality must establish: (1) a constitutional violation by a municipal employee, (2) the existence of a municipal custom or policy, and (3) a direct causal link between the custom or policy and the violation alleged. 436 U.S. 658, 694 (1978).

The alleged municipal policy or custom

"A municipal policy or custom may take the form of (1) a formal regulation or policy statement; (2) an informal custom amounting to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; (3) the decisions of employees with final policymaking authority; (4) the ratification by such final policymakers of the decisions—and the basis for them—of subordinates to whom authority was delegated subject to these policymakers' review and approval; or (5) the failure to adequately train or supervise employees, so long as that failure results from deliberate indifference to the injuries that may be caused." *Bryson v. City of Oklahoma City*, 627 F.3d 784, 788 (10th Cir. 2010) (internal quotation marks omitted).

In the SAC—as well as in the Proposed Third Amended Complaint—Plaintiff does not identify a specific Mesa County ["the County"] policy that gave rise to an alleged constitutional violation. Plaintiff instead seeks to add factual allegations that Defendant Lewis, and by extension the County, "monitored all issues related to inmates [sic] grievances … the performance of CCS personnel at the jail, the outside [of jail] medical needs of inmates, and budgetary and cost considerations of jail expenditures related to medical care." (Doc No. 158 at 12.) Plaintiff appears to imply that Mesa County failed to carry out these tasks in a

constitutionally adequate manner. In reviewing Plaintiff's proposed amendments, his allegations could be construed as alleging a failure by the County, specifically the Sherriff's office, in generally supervising the CCS medical personnel at MCDF. On the other hand, Plaintiff's claims could also be construed as alleging the County itself has a custom of inattentive or inadequate involvement in inmate healthcare.

Insofar as Plaintiff seems to allege that the County failed to properly supervise CCS medical personnel, it could give rise to § 1983 liability. *See, e.g.*, *Oslon v. Sherburne County*, 2009 WL 3711548, at *6 (D. Minn. Nov. 3, 2009) ("A municipality remains subject to liability if its failure to adequately train or supervise medical personnel was the moving force behind a constitutional violation even though the medical personnel were employed by an independent contractor."); *Gazzola v. County of Nassau*, 2022 WL 2274710, at *12 (E.D.N.Y. June 3, 2022) (saying the same); *Preston v. County of Macomb*, 2022 WL 4590573, *31–33 (E.D. Mich. Sept. 29, 2022) (saying the same). However, neither the operative Complaint nor the proposed amendment add any factual support to a failure to supervise municipal liability claim. While Plaintiff alleges that Mesa County had a role in supervising Defendant CCS, he does not explain how or why the County failed to fulfill this responsibility properly. Indeed, the statement that a Mesa County official was in charge of supervising CCS does not, standing alone, establish that such supervision was constitutionally inadequate. *See Waller v. City and County of Denver*, 932 F.3d 1277, 1288–89 (10th Cir. 2019) (affirming the dismissal of a failure to supervise-based municipal liability claim because the plaintiff failed to "allege[] any facts regarding any supposed supervisory deficiencies in the Denver Sheriff Department, much less any facts

describing how Deputy Lovingier's supervision was inadequate or how his purportedly inadequate supervision caused [the plaintiff's] injury").

Likewise, if Plaintiff's allegations are construed as alleging Mesa County has a custom of inattentive or inadequate involvement in inmate healthcare, this too could give rise to § 1983 liability. *See, e.g.*, *Vigil v. Laurence*, 524 F.Supp.3d 1120, 1129 (D. Colo. 2021) (denying a motion to dismiss a *Monell* claim that was based on an alleged "custom, policy, and practice of arbitrarily delaying and denying prisoners' requests for medical care"). Again, however, Plaintiff does not support his allegations with facts tending to establish that the County has acted in a constitutionally impermissible manner. For example, Plaintiff states that the County "monitored all issues related to inmate['s] grievances," but does not allege that this was improperly handled, let alone allege a pattern of insufficient responses to inmate grievances. (Doc No. 158 at 12.) Similarly, Plaintiff alleges that the County was in charge of "cost considerations" and "expenditures" related to inmate healthcare, but he does not allege facts tending to show these tasks have been inappropriately carried out. (*Id.*) Accordingly, as pled in the proposed amendment, Plaintiff has not sufficiently supported the allegation that the County has a custom of inattentive or inadequate involvement in inmate healthcare. *See Frey v. Reams*, 2018 WL 582400, *6 (D. Colo. January 29, 2018) ("Adequately alleging municipal liability under § 1983 can certainly be challenging, but the pleading requirements under *Twombly* are not negotiable.").

Because Plaintiff has not identified a policy or custom sufficient to support a § 1983 municipal liability claim, the Court declines to address the remaining elements under *Monell*. Further, because Plaintiff's allegations, as amended by the Proposed Third Amended Complaint, do not assert a viable claim against Defendant Lewis in his official capacity, Plaintiff's proposed

amendment would be futile. However, because Plaintiff does identify a notionally viable

theory—that Mesa County has failed to supervise CCS or has a custom inattentive or inadequate

oversight of inmate health care—and because Plaintiff proceeds *pro se*, the Court recommends

that Defendant Lewis' Motion to Dismiss be granted without prejudice as it relates to this claim,

giving Plaintiff an opportunity to gather specific facts that demonstrate a failure to supervise or

custom of inattentive or inadequate involvement in inmate healthcare should he find himself

able.

### iii.   Defendant CCS

The final claim impacted by the Proposed Third Amended Complaint is Plaintiff's

municipal liability claim against Defendant CCS.[17] As a threshold matter, the principles of

municipal liability have been found to apply to § 1983 claims brought against private

corporations working on a government's behalf, such as Defendant CCS. *See Dubbs v. Head*

*Start, Inc.*, 336 F.3d 1194, 1216 (10th Cir. 2003) ("Although the Supreme Court's interpretation

of § 1983 in *Monell* applied to municipal governments and not to private entities acting under

color of state law, case law from this and other circuits has extended the *Monell* doctrine to

private § 1983 defendants."). However, Defendant CCS "cannot be held liable solely because it

employs a tortfeasor—or, in other words … cannot be held liable under § 1983 on a respondeat

superior theory." *Monell*, 436 U.S. at 691. To survive a motion to dismiss, Plaintiff must allege

facts tending to show that a policy or custom of Defendant CCS has a direct causal link to the

---

[17] Plaintiff also brings suit against Defendant Holmes and Defendant McLaughlin in their official capacities. *See Cano*, 2013 WL 322112 at *5 ("A claim against a state actor in his official capacity 'is essentially another way of pleading an action against the county or municipality' and is considered under the standard applicable to § 1983 claims against municipalities or counties." (quoting *Porro*, 624 F.3d at 1328)).

alleged constitutional violation *See Smedley v. Corr. Corp. of Am.*, 175 Fed. Appx. 943, 944 (10th Cir. 2005).

The alleged constitutional violation

As to the first element, Plaintiff alleges that Defendants McLaughlin and Holmes violated his Fourteenth Amendment rights by acting deliberately indifferent to his serious medical needs. The Court analyzes Plaintiff's deliberate indifference claims *infra*, concluding that the claim against Defendant McLaughlin was sufficiently pled in the operative Complaint to survive the CCS Defendant's Motion to Dismiss. As such, the Court will advance to the second prong of a *Monell* claim, the alleged CCS policy or custom.

The alleged municipal policy or custom

In the SAC, Plaintiff's allegations against Defendant CCS sound in respondeat superior theory—in other words, that Defendant CCS is liable simply because their employee, Defendant McLaughlin, and their affiliated doctor, Defendant Holmes, committed alleged constitutional violations. However, in the proposed amendment, Plaintiff seeks to add factual allegations that Defendant CCS contracts with Mesa County to develop, administer, and "control[] all aspects of healthcare available to inmates in Mesa County Jail," and has a policy or custom of "(1) understocking or not timely securing inmates [*sic*] necessary prescription medications [and] (2) [a] widespread custom of disregarding or ignoring serious medical needs and conditions." (Doc. No. 182 at 2–3.)

When making a *Monell* claim, "[t]he plaintiff cannot simply allege that there is a policy in place, but, rather, must plead facts that, if true, would give rise to a plausible inference that such a policy exists. With formal or written policies, satisfying this pleading standard is easy; the

plaintiff can simply allege what the policy is and where it is codified." *Griego v. City of Albuquerque*, 100 F. Supp. 3d 1192, 1213 (D.N.M. 2015); *see Plutt v. Armor Correctional Health Services, Inc.*, 2022 WL 4536234, *9 (D. Colo. September 28, 2022) ("To base a municipal liability claim on an unconstitutional formal policy, a plaintiff should set out the text of that policy." (citing *Sandberg v. Englewood*, 727 F. App'x 950, 964 (10th Cir. 2018))). Here, however, because Plaintiff's proposed amendments do not set out any formal CCS policy, Plaintiff must allege "informal custom(s) amounting to a widespread practice." *Bryson*, 627 F.3d at 788.

Municipalities, and their private representatives, may "incur liability when they adopt unconstitutional longstanding practice[s] or custom[s] that become 'standard operating procedure[s]." *Murphy v. City of Tulsa*, 950 F.3d 641, 649 (10th Cir. 2019) (internal quotation omitted) "In attempting to prove the existence of such a continuing, persistent and widespread custom, plaintiffs most commonly offer evidence suggesting that similarly situated individuals were mistreated by the municipality in a similar way." *Carney v. City & Cnty of Denver*, 534 F.3d 1269, 1274 (10th Cir. 2008); *see Sorlucco v. New York City Police Dept.*, 971 F.2d 864, 871 (2nd Cir. 1992) ("[B]efore the actions of subordinate city employees can give rise to § 1983 liability, their discriminatory practice must be so manifest as to imply the constructive acquiescence of senior policy-making officials.")

> With informal, unwritten policies, customs, or practices, the plaintiff can plead either a pattern of multiple similar instances of misconduct—no set number is required, and the more unique the misconduct is, and the more similar the incidents are to one another, the smaller the required number will be to render the alleged policy plausible—or use other evidence, such as a police officers' statements attesting to the policy's existence.

*Griego*, 100 F. Supp. 3d at 1213.

Here, in support of his allegations that CCS has a custom of "understocking" and "ignoring serious medical needs," Plaintiff states that he "can show that delay and denial of *my* medical care[,] especially in relation to HIV[,] has been a persistent pattern as there has been notices that have been given by grievances and medial request[s] to CCS['s] medical department." (Doc. No. 182 at 2–3 (emphasis added).) Plaintiff's Motion to Amend states that Plaintiff "want[s] to share with the [C]ourt what [he's] learned about other cases … that CCS has widespread policies and practices of providing inadequate medical care by delay … that it can be no less then [*sic*] corporate policy." (Doc. No. 186 at 2.) However, neither the SAC, nor the Proposed Third Amended Complaint allege facts demonstrating any specific pattern or other evidence—such as statements by CCS employees or officials, or facts from the other alleged cases Plaintiff wants to share with the Court—to support Plaintiff's contention that Defendant CCS has a custom of failing to adequately stock medication or treat medical conditions. (*See* Doc. Nos. 158, 182.)

In *Eaves v. El Paso Board of County Commissioners*, the plaintiff alleged that he was denied medical care by CCS after being assaulted by El Paso County Deputies while he was a pretrial detainee at El Paso County Correctional Facility. 2018 WL 1256508 (D. Colo. March 12, 2018) In making a *Monell* claim against CCS, the plaintiff asserted that CCS had "policies and procedures" which "denied [him] the ability to have [his] own doctor to review those records and get appropriate care for [his] injuries," but he did not provide significant factual support for the claim. *Id.* at 4. The court concluded that because plaintiff "only alleges facts relating to his own delays in medical care, and fails to allege any facts that indicate that his denial of medical care was a widespread custom or policy affecting other prisoners" the claim had to be dismissed. *Id.*

Likewise, here, Plaintiff's Proposed Amended Complaint makes sweeping allegations about alleged informal policies or customs held by Defendant CCS but does not plead facts that generally support such claimed customs actually exist. Though Plaintiff claims he has evidence of a "persistent pattern," this evidence is not alleged in the operative Complaint nor the Proposed Amended Complaint. Instead, Plaintiff alleges facts relating to his own care and extrapolates them to claim that Defendant CCS held widespread customs of failing to timely secure medication and failing to take inmate medical complaints seriously. Even drawing all inferences in Plaintiff's favor, and accounting for the fact that Plaintiff proceeds *pro se*, the allegations in the Proposed Amended Complaint are simply insufficient to support a § 1983 municipal liability claim based on an informal policy or custom. *See Griego*, 100 F.Supp at 1213 ("[The Tenth Circuit has] implied that district courts should analyze policies, practices, or customs under *Monell* as "legal conclusions" at the pleading stage—which must be supported by facts, rather than conclusorily alleged—and not "facts" in and of themselves, to be taken as true at face value." (citing *Martinez v. Winner*, 771 F.2d 434, 443–44 (10th Cir. 1985))); *Wilson v. Cook County*, 742 F.3d 755, 780 (7th Cir. 2014) ("Although this court has not adopted any bright-line rules for establishing what constitutes a widespread custom or practice, it is clear that a single incident—or even three incidents—do not suffice.")

Because Plaintiff's claim fails on this basis, the Court declines to address the causation element under *Monell*. Further, because Plaintiff's allegations, as amended by the Proposed Third Amended Complaint, do not assert a viable claim against Defendant CCS, Plaintiff's proposed amendment would be futile. Therefore, the Court recommends that Plaintiff's Motion to Amend be denied at this time. However, because Plaintiff references a "persistent pattern" and

"other cases" in connection with his allegations of understocking and undertreating, and because Plaintiff proceeds *pro se*, the Court recommends that Defendant CCS's Motion to Dismiss be granted without prejudice as it relates to this claim, giving Plaintiff an opportunity to gather specific facts that demonstrate an alleged pattern or widespread practice should he find himself able.

## II.   Motions to Dismiss

After analyzing the claims that would be affected by the Proposed Third Amended Complaint, the Court will now review Defendants' Motions to Dismiss Plaintiff's remaining claims.

### a.   *Deliberate Indifference Claims*

Plaintiff claims that Defendant McLaughlin and Holmes violated his constitutional rights because they were deliberately indifferent to his obvious, serious medical needs while Plaintiff was a pretrial detainee at MCDF.

"The Fourteenth Amendment's Due Process Clause entitles pretrial detainees to the same standard of medical care owed to convicted inmates under the Eighth Amendment. Thus, [t]he Fourteenth Amendment is violated if state officials are deliberately indifferent to a pretrial detainee's serious medical needs." *Rife v. Okla. Dep't of Pub. Safety*, 854 F.3d 637, 647 (10th Cir. 2017) (citations omitted). In the context of a medical treatment claim, two types of conduct may constitute deliberate indifference: "(1) a medical professional failing to treat a serious medical condition properly; and (2) a prison official preventing an inmate from receiving medical treatment or denying access to medical personnel capable of evaluating the inmate's condition." *Self v. Crum*, 439 F.3d 1227, 1231 (10th Cir. 2006) (citing *Sealock v. Colorado*, 218

F.3d 1205, 1211 (10th Cir. 2000)). "Negligent diagnosis or treatment is not enough to demonstrate a constitutional violation." *Suro v. Tiona*, 784 F. App'x 566, 569 (10th Cir. 2019) (citing *Self*, 439 F.3d at 1230). Notably, the Fourteenth Amendment is not infringed when a medical professional "simply resolves the question [of] whether additional diagnostic techniques or forms of treatment is indicated." *Self*, 439 F.3d at 1232 (quoting *Estelle v. Gamble* 429 U.S. 97, 107 (1976)). Further, "an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot . . . be condemned as the infliction of punishment." *Farmer v. Brennan*, 511 U.S. 825, 838 (1994).

A Fourteenth Amendment deliberate indifference claim requires the satisfaction of both an objective and a subjective component. *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005) (citing *Sealock*, 218 F.3d at 1209). The objective component requires that the inmate "produce objective evidence that the deprivation at issue was in fact 'sufficiently serious.'" *Id.* (quoting *Farmer*, 511 U.S. at 834). "A medical need is sufficiently serious 'if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Sealock*, 218 F.3d at 1209 (quoting *Hunt v. Uphoff*, 199 F.3d 1220, 1224 (10th Cir. 1999)). "Where the necessity for treatment would not be obvious to a lay person, the medical judgment of the physician, even if grossly negligent, is not subject to second-guessing in the guise of [a Fourteenth] Amendment claim." *Mata*, 427 F.3d at 751 (citing *Green v. Branson*, 108 F.3d 1296, 1303 (10th Cir. 1997)). A delay in medical care "only constitutes an [Fourteenth] Amendment violation where the plaintiff can show the delay resulted in substantial harm." *Id.* (quoting *Oxendine v. Kaplan*, 241 F.3d 1272, 1276 (10th Cir. 2001)). "Substantial harm" includes "lifelong handicap, permanent

loss, or considerable pain." *Id.* (quoting *Garrett v. Stratman*, 254 F.3d 946, 950 (10th Cir. 2001)); *see also Al-Turki v. Robinson*, 762 F.3d 1188, 1193 (10th Cir. 2014) (observing that "substantial harm" can also be established by showing "an intermediate injury, such as the pain experienced while waiting for treatment and analgesics").

To satisfy the subjective component, an inmate must "present evidence of the prison official's culpable state of mind." *Mata*, 427 F.3d at 751 (citing *Estelle*, 429 U.S. at 106). "[D]eliberate indifference is a stringent standard of fault." *Bd. of Cty. Comm'rs v. Brown*, 520 U.S. 397, 410 (1997). "A showing of simple or even heightened negligence will not suffice." *Id.* at 407. Rather, the defendant must "know[] of and disregard[] an excessive risk to inmate health and safety." *Farmer*, 511 U.S. at 837. In other words, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.*

In their Motion to Dismiss, Defendants McLaughlin and Holmes spend little time refuting Plaintiff's contention that his HIV and hip pain were medical conditions "sufficiently serious" to satisfy the objective prong of the deliberate indifference analysis. (Doc. No. 161 at 9.) Indeed, Plaintiff's HIV is unquestionably an ailment diagnosed by a physician as "mandating treatment," and severe hip pain which impedes one's ability to walk, sleep, or dress is an ailment "so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Sealock*, 218 F.3d at 1209. Instead, Defendants McLaughlin and Holmes argue that Plaintiff has failed to establish either had personal involvement in the alleged constitutional violation, "much less satisfy the subjective component of the deliberate indifference analysis." (*Id.* at 10–12.) The Court considers those arguments below.

<u>Defendant McLaughlin</u>

Defendant McLaughlin argues that the operative Complaint does not sufficiently allege her personal involvement in the purported constitutional violation to support a § 1983 claim against her. *See Grimsley v. MacKay*, 93 F.3d 676, 679 (10th Cir. 1996) ("[I]n order to successfully assert a § 1983 claim … a plaintiff must show personal involvement or participation in the [alleged violation]."). She further argues that, even if the Complaint did contain sufficient facts generally to support a § 1983 claim, the Complaint does not establish a prima facie case for deliberate indifference because Plaintiff has not established that Defendant McLaughlin subjectively understood the risks to Plaintiff's health and disregarded them anyway.

To establish § 1983 liability in an individual capacity, "the plaintiff must establish a deliberate, intentional act on the part of the defendant 'to violate [the plaintiff's legal] rights." *Parro v. Barnes*, 624 F.3d 1322, 1327–28 (10th Cir. 2010) (internal quotation omitted). Because personal participation is an essential element, Plaintiff must show that each named Defendant personally caused the deprivation of a federal right. *Kentucky v. Graham*, 473 U.S. 159, 166 (1985). A defendant is personally involved in an alleged constitutional violation only if there is an "affirmative link" between her conduct and the described violation. *Stidham v. Peace Officer Stds & Training*, 265 F.3d 1144, 1156 (10th Cir. 2001).

Regarding the delay in obtaining HIV medication, Plaintiff's allegations attribute much of the blame to Defendant McLaughlin. During his initial health screening after arriving at MCDF, Plaintiff was informed that Defendant McLaughlin would be the point person in charge of identifying and procuring his HIV medication following the screening. (Doc. No. 158 at 8–9.) However, Plaintiff's medication was not obtained subsequent to the screening. (*Id.*) Six weeks

after the screening, Defendant McLaughlin indicated via kite that she was aware of Plaintiff's need for medication, and yet, another two months passed without Plaintiff receiving an update on its status. (*Id.* at 9.) Later, Defendant McLaughlin ostensibly received but failed to pass along Plaintiff's affirmative response to a kite from Dr. Davis' which had asked whether she needed to write a prescription for his HIV medication. (*Id.* at 12, 15.) Only after Dr. Davis learned that Plaintiff had still not received his medication, nearly five months after arriving at MCDF, was action taken to procure it. (*Id.* at 12, 18.) Indeed, after an extended period of failing to obtain it himself, Plaintiff was provided two of his three medications *the day after* Dr. Davis raised her concerns. (*Id.* at 13.)

Taking Plaintiff's allegations as true, the Court finds that, with respect to the delay in obtaining HIV medication, Plaintiff has pled facts sufficient to establish Defendant McLaughlin's personal participation in the alleged constitutional violation. First, Plaintiff's allegations tend to establish that Defendant McLaughlin had significant control over his ability to receive HIV medication. Further, Plaintiff's allegations tend to establish that Defendant McLaughlin was aware of his need for medication and, for some reason, declined to procure the medication until prompted by Dr. Davis approximately five months after Plaintiff completed his initial health screening. The allegations are sufficient to establish an affirmative link between Defendant McLaughlin's conduct and the alleged violation.

In her Reply, Defendant McLaughlin argues that as a Licensed Nurse Practitioner, she "cannot make any medical diagnosis … decisions … order medications … [or] make referrals." However, even if Defendant McLaughlin cannot make a diagnosis or pesonally order medications, it is plausible (and indeed Plaintiff plausibly alleges) that as the Health Service

Administrator at MCDF, Defendant McLaughlin had a meaningful role in facilitating the procurement of medication for inmates. *See Tivis v. Dowis*, 2014 WL 4413216, at *9 (D. Colo. Sept. 8, 2014) ("A prison official who 'knows that [her] role in a particular medical emergency is solely to serve as a gatekeeper for other medical personnel capable of treating the condition' may be held liable if that person delays or refuses to fulfill that gatekeeper role." (quoting *Sealock*, 218 F.3d at 1209)); *Twombly*, 550 U.S. 544 (making clear that a 12(b)(6) analysis focuses on whether a complaint is "plausible," not whether a defendant can articulate a set of competing facts). Thus, the facts presented by Plaintiff regarding Defendant McLaughlin's job at the prison, her knowledge of his need for medication, and her failure to procure said medication are sufficient to establish Defendant McLaughlin's personal involvement in the alleged constitutional violation. *See Alexander v. Weiner*, 841 F. Supp. 2d 486, 493 (D. Mass. 2012) (denying a motion to dismiss for a failure to allege personal involvement in a deliberate indifference claim against a prison medical director when the director failed to permit an inmate to receive her prescribed treatment for gender identity disorder).

Further, Plaintiff's factual allegations are sufficient to satisfy the subjective prong and establish a plausible prima facie case of deliberate indifference against Defendant McLaughlin. The operative Complaint tends to establish that Defendant McLaughlin knew Plaintiff suffers from HIV and was at significant health risk without his medications, and yet declined to take action to procure them. And although the CCS Defendants argue that the delay in care did not result in "substantial harm" and thus cannot constitute a constitutional violation (*see* Doc. No. 175 at 15), Plaintiff's allegations indicate otherwise. (*See* Doc. No. 158 at 12–14, 18 (alleging

that after multiple months without his HIV medication, Plaintiff's T-cell count dropped from over 500 to 283—a number considered "very low"—and he developed sores all over his body).)

These allegations, taken as true, amount to something more than sub-standard or negligent treatment. Instead, they amount to a reckless disregard for Plaintiff's health. *See Rivera v. Sheahan*, 1998 WL 531875, at *6 (N.D. Ill. Aug. 14, 1998) (saying that the knowing failure to provide a detainee with needed AIDS medication was "[f]ar from barely rising to the level of negligence," while denying the motion to dismiss the related deliberate indifference claim); *Estate of Walter by and through Klodnicki v. Correction Healthcare Companies, Inc.*, 323 F.Supp.3d 1199 (D. Colo. 2018) (declining to grant summary judgment to prison medical employees who were allegedly deliberately indifferent by depriving an inmate of his prescription anti-anxiety medication, creating severe withdrawal symptoms that eventually killed him); *Kneen v. Zavaras*, 885 F.Supp.2d 1055, 1061 (D. Colo. 2012) (declining to dismiss a deliberate indifference claim against the prison health administrator when the defendant "knew that the Plaintiff had been diagnosed with chronic Hepatitis C over ten years ago, had lab results which indicated that treatment was immediately warranted, and had also suffered from Esophageal Varicies, a serious and life threatening complication of cirrhosis" but failed to take action). Accordingly, the Court recommends denying Defendant McLaughlin's Motion to Dismiss Plaintiff's deliberate indifference claim insofar as it relates to the delay in obtaining HIV medication.

Conversely, with regard to Plaintiff's hip pain, the Court agrees with Defendant McLaughlin's assertion that the operative Complaint does not establish her personal participation in the alleged constitutional violation. According to Plaintiff, Defendant McLaughlin's role in

addressing his hip pain was almost exclusively to set appointments with doctors or relay information provided by Defendant Holmes. (*See* Doc. No. 158 at 9, 14–15.) In fulfilling this role, Defendant McLaughlin did not "fail[] to treat a serious medical condition properly … prevent[] [Plaintiff] from receiving medical treatment or deny[] access to medical personnel capable of evaluating [Plaintiff's] condition." *Self*, 439 F.3d at 1231. Plaintiff does not allege Defendant McLaughlin failed to procure certain medication or denied Plaintiff's request to see an orthopedic surgeon or other provider in connection with the hip pain. In other words, Plaintiff has not established an affirmative link between Defendant McLaughlin's actions and the alleged constitutional violation related to his hip. Accordingly, the Court recommends granting Defendant Motion to Dismiss Plaintiff's deliberate indifference claim insofar as it relates to the medical treatment he received related to his hip pain.

<u>Defendant Holmes</u>

Like Defendant McLaughlin, Defendant Holmes contends that Plaintiff has not established his personal involvement in the alleged constitutional violation, or in the alternative, Plaintiff has not pled facts sufficient to establish that Defendant Holmes' conduct met the subjective prong of the deliberate indifference standard.

The allegations against Defendant Holmes almost exclusively concern Plaintiff's hip pain. Specifically, Plaintiff contends that, after originally declaring his hip "bone on bone," (Doc. No. 158 at 10), Defendant Holmes declined to set up an appointment with an outside orthopedic surgeon, or an appointment for a second opinion on a pain relief injection, as initially promised. (*Id.* at 10–12.) Plaintiff says the reason provided to him was that after further review Defendant

Holmes determined that the hip issue was not an emergency requiring immediate follow-up. (*Id.* at 19.)

Importantly, the Fourteenth Amendment is not infringed when a medical professional "simply resolves the question [of] whether additional diagnostic techniques or forms of treatment" are necessary. *Self*, 439 F.3d at 1232 (quoting *Estelle*, 429 U.S. at 107). Further, "[a]bsent obvious risk, the need for additional treatment usually is a question of medical judgment, which is not a predicate for deliberate indifference." *Sparks v. Singh*, 690 F. App's 598, 608 (10th Cir. 2017). *See Perkins v. Kansas Dep't of Corr.*, 165 F.3d 803, 811 (10th Cir. 1999) ("A prisoner who merely disagrees with a diagnosis or a prescribed course of treatment does not state a constitutional violation."). And, even if Defendant Holmes made a poor medical decision in changing his mind and not setting up additional appointments for Plaintiff, "[a]t most, such a decision may constitute a 'negligent failure to provide adequate medical care, even one constituting medical malpractice...[but this] does not give rise to a constitutional violation.'" *Oakley v. Phillips*, 2015 WL 5728734, at *6 (D. Colo. 2015) (quoting *Perkins*, 165 F.3d at 811); *see Oakley*, 2015 WL 5728734 (dismissing a deliberate indifference claim against a prison medical provider who declined to order follow up tests or procedures when an initial blood test came back negative).

Plaintiff attempts to save his claim against Defendant Holmes by hazily suggesting that Defendant Holmes' decision-making was colored by considerations other than Plaintiff's medical well-being. Specifically, Plaintiff refers to Dr. Holmes' discussions with "the insurance company" about making a referral during the period following Plaintiff's x-ray. (Doc, No. 158 at 10) Plaintiff seems to believe that Dr. Holmes' decision not to refer him for outside hip

appointments was based on some nefarious, non-medical consideration connected to his discussions with the insurance company. However, than other raising this as a possibility, Plaintiff has not pled any additional facts which support the claim. Bare assertions without factual averment "are not entitled to the assumption of truth," otherwise afforded to a plaintiff in a 12(b)(6) analysis. *Iqbal*, 556 U.S. at 679–81. While Plaintiff may believe that other considerations, such as cost, played a role in the treatment of his hip pain, he has not pled facts that plausibly support this belief. *See Sherman v. Klenke*, 653 Fed.Appx. 580, 592 (10th Cir. 2016) ("The naked assertion that Defendants considered cost in treating [an inmate's medical condition] does not suffice to state a claim for deliberate indifference.") As such, the Court cannot say that the allegations, even when taken as true, are sufficient to establish that Defendant Holmes made decisions for non-medical reasons—let alone that he was deliberately indifferent to Plaintiff's hip condition.

Additionally, Plaintiff makes a few similarly vague allegations about Defendant Holmes' role in the HIV medication delays, specifically referring to his leadership role. For example, Plaintiff says that Defendant Holmes is "[r]esponsible for [the] overall management [of the MCDF medical system, as well as] treatment and evaluations," and thus tends to imply that Defendant Holmes is liable for any violation by a subordinate. (Doc. No. 158 at 3.) However, as discussed above, a valid supervisory liability claim requires an "affirmative link" between the defendant and the alleged constitutional violation—either through a specific policy promulgated, enforced, or maintained by the defendant or through allegations which clearly establish a failure to supervise. *Gallagher*, 587 F.3d at 1069; *see Perry*, 892 F3d at 1121 ("[Section 1983 does not]

authorize liability under a theory of respondeat superior."). Plaintiff's allegations do not directly tie Defendant Holmes to the delay in obtaining HIV medication.

For these reasons, the Court recommends granting Defendant Holmes' Motion to Dismiss the deliberate indifference claim brought against him.

### b. Negligence

Finally, although not explicitly stated in the operative Complaint, the Court construes the SAC as making a state-law tort claim for negligence against the CCS Defendants. The Court has supplemental jurisdiction over these state law claims. *See* 28 U.S.C. § 1367. Further, because all alleged events occurred in Colorado, Colorado law applies. *Bancoklahoma Mortg. Corp. Capital Title Co.*, 194 F.3d 1089, 1103 (10th Cir. 1999) (saying that federal courts apply state law to claims before the court on supplemental jurisdiction).

<u>Defendant Holmes</u>

Defendant Holmes argues that Plaintiff has not complied with the "certificate of review" requirements under C.R.S. § 13-20-602, or in the alternative, that Plaintiff has not established the requisite elements for a medical negligence claim.

C.R.S. § 12-20-602 provides that

> In every action for damages or indemnity based upon the alleged professional negligence of ... a licensed professional, the plaintiff's or complainant's attorney shall file with the court a certificate of review for each ... licensed professional named as a party, as specified in subsection (3) of this section, within sixty days after the service of the complaint, counterclaim, or cross claim against such person unless the court determines that a longer period is necessary for good cause shown.

"The certificate of review must demonstrate that the plaintiff has consulted a professional with expertise in the area of the alleged negligent conduct who has reviewed the known facts, records

and other materials deemed relevant to the allegations and, 'based on the review of such facts, has concluded that the filing of the claim...does not lack substantial justification within the meaning of section 13-17-102(4).'" *Morales v. Rattan*, 2019 WL 588192, at *3 (D. Colo. Feb. 13, 2019) (quoting C.R.S. § 12-20-602(3)(a)). "The certificate of review requirement … acts as an affirmative defense that may be waived." *Tuttamore v. Allred*, 2013 WL 248163, at *3 (D. Colo. Jan. 23, 2013) (citing *Miller v. Rowtech, LLC*, 3 P.3d 492, 494-95 (Colo. App. 2000)).

The certificate of review applies to claims considered by federal courts applying Colorado law. *See Hill v. SmithKline Beecham Corp.*, 393 F.3d 1111, 1118 (10th Cir. 2004). However, a certificate of review is not required in *all* cases asserting negligence against a licensed professional, but only those in which "expert testimony is necessary to substantiate the claim." *Sherman v. Klenke*, 653 F. App'x 580, 595 (10th Cir. 2016). Courts have "discretion to determine if a certificate of review is necessary," *Fogle v. Elliott*, 2012 WL 5363800, at *9 (D. Colo. Sept. 18, 2012). However, "if a certificate is deemed necessary, courts will not exempt pro se plaintiffs from filing one and must dismiss the professional negligence claim if a certificate is not filed." *Morales*, 2019 WL 588192, at *4 (citing *Yadon v. Southward*, 64 P.3d 909, 912 (Colo. App. 2002); *Hill*, 393 F.3d at 1118)).

Here, Plaintiff has not filed a certificate of review regarding his claim for medical negligence against Defendant Holmes, a licensed medical doctor. Thus, Plaintiff's claim should be dismissed if the Court determines that expert testimony would be necessary to substantiate the claim.

"Generally, expert testimony in medical malpractice actions is 'necessary to determine the standards of professional care and competence which define the concept of reasonableness

appropriate to adjudication of such disputes.'" *Morales*, 2019 WL 588192, at *4 (quoting G*orab v. Zook*, 943 P.2d 423, 427–28 n.5 (Colo. 1997)). "The question of whether a medical professional's conduct meets the professional standard of care is not within the ambit of common knowledge under Colorado law." *Shinn v. Melberg*, 2014 WL 334662, at *3 (D. Colo. Jan. 30, 2014); *see also Martinez v. Badis*, 842 P.2d 245, 252 (Colo. 1992) (saying that Colorado courts have applied the certificate of review requirement "to all claims against licensed professionals wherein expert testimony is required to establish the scope of the professional's duty or the failure of the professional to reasonably conduct himself or herself in compliance with the responsibilities inherent in the assumption of the duty"). *Cf. Hamilton v. Hardy*, 37 Colo. App. 375, 549 P.2d 1099 (1976) (holding that expert testimony is not required in medical negligence case alleging lack of informed consent); *Williams v. Boyle*, 72 P.3d 392, 397 (Colo. App. 2003) (saying that expert testimony is not required for medical negligence claims relying on the doctrine of *res ipsa loquitur*).

Here, the operative Complaint alleges that Defendant Holmes undertreated or mistreated Plaintiff's hip pain. (*See generally* Doc. No. 158.) Specifically, Plaintiff claims that after reviewing his x-rays, Defendant Holmes miscategorized his hip condition as "non-emergent" and thus improperly declined to promptly schedule an appointment with an outside orthoepic surgeon and failed to take sufficient steps to analyze the feasibility of a pain injection for Plaintiff. (See id. at 10–12.)

However, these allegations are squarely of the type which generally require expert testimony to substantiate and, thus, a certificate of review. As to Plaintiff's hip, the central question is whether Defendant Holmes misdiagnosed the condition or otherwise failed to act

with the necessary speed and concern. This question falls squarely into "the standards of professional care and competence which define the concept of reasonableness" in medical negligence actions. *Gorab*, 943 P.2d at 427–28 n.5 (Colo. 1997)) That is, questions which regard the "scope of the professional's duty or the failure of the professional to reasonably conduct himself." *Martinez*, 842 P.2d at 252; *see also Morales*, 2019 WL 588192, at *6 (holding that expert testimony, and thus a certificate of review, were required for allegations regarding the misdiagnosis of an "ulcer or infection as a foot fungus that could be treated by a fungal cream," which resulted in the amputation of the plaintiff's toe); *Williams*, 72 P.3d at 397-98 (finding that plaintiff would require expert testimony to show nature of physician's "duty of care with regard to diagnosis and follow up treatment"); *Smith v. Trujillo*, 2021 WL 1799400, at *11 (D. Colo. Mar. 26, 2021) (finding that expert testimony was required for negligence claim arguing that physician breached duty of care by denying plaintiff an MRI), *report and recommendation adopted* 2021 WL 1608829 (D. Colo. Apr. 26, 2021).

For this reason, the Court recommends dismissing the medical negligence claim against Defendant Holmes without prejudice giving Plaintiff an opportunity to seek a certificate of review if he so chooses.

<u>Defendant McLaughlin and Defendant CCS</u>

The CCS Defendants further argue that any claim for vicarious liability against Defendant CCS should be denied because Plaintiff has failed to establish that its employee, Defendant McLaughlin, was negligent in managing Plaintiff's care at MCDF.[18]

---

[18] In their Motion to Dismiss, the CCS Defendants do not argue that the negligence claim against Defendant McLaughlin sounds in professional negligence and thus may require a certificate of review. (Doc. No. 161 at 18–19.)

Under Colorado law, a plaintiff must establish (1) he was owed a legal duty by the defendant; (2) the defendant breached that duty; (3) the plaintiff was injured; and (4) the defendant's breach was the proximate cause of the plaintiff's injury. *Greenberg v. Perkins*, 845 P.2d 530, 533 (Colo. 1993). A plaintiff who brings an actionable claim for negligence against an individual may assert a vicarious liability claim against the individual's employer if the individual was "acting in the scope and course of their employment," under the theory of respondeat superior. *Henisse v. First Transit, Inc.*, 247 P.3d 577, 581 (Colo. 2011) (citing *Hamm v. Thompson*, 143 Colo. 298, 303, 353 P.2d 73, 75 (1960). The Court notes that though Plaintiff does not use the "language" of a negligence claim in the operative Complaint, the Court is to read *pro se* pleadings "liberally." *Trackwell*, 472 F.3d at 1243.

With respect to the first element, the Court must be satisfied that the defendant owed "a duty to act or refrain from acting in order to avoid injury." *Casebolt v. Cowan*, 829 P.2d 352, 356 (Colo. 1992). When considering whether a duty of care is owed, Colorado courts consider "the risk involved, the foreseeability and likelihood of injury as weighed against the social utility of the actor's conduct, the magnitude of the burden of guarding against injury or harm, and the consequences of placing the burden upon the actor." *Univ. of Denver v. Whitlock*, 744 P.2d 54, 57 (Colo. 1987). "No one factor is controlling and the issue essentially comes down to fairness under contemporary standards." *Ulibarri v. City & County of Denver*, 742 F.Supp.2d 1192, 1225 (D. Colo. 2010) (internal quotation omitted). Here, Plaintiff has alleged sufficient facts to demonstrate that Defendant McLaughlin owed a duty to prison inmates under her care and supervision. Taking Plaintiff's allegations as true, as Health Service Administrator, Defendant McLaughlin had significant control over inmate access to care, including the scheduling of

appointments, the procurement of prescriptions, and communication with outside providers. As such, injuries to inmates caused by Defendant McLaughlin's actions or failures to act were foreseeable, and the risk to those inmates was significant. *Cf. Ulbarri*, 742 F.Supp.2d at 1225–26 (finding that jail staff has a duty to take reasonable care to prevent an inmate from committing suicide, "in accordance with the knowledge and skill ordinarily possessed by other practitioners under similar circumstances." (quoting *Perreira v. State*, 768 P.2d 1198, 1220 (Colo. 1989))).

Further, reviewing the allegations in a light most favorable to Plaintiff, the Court finds that Plaintiff has pled sufficient facts to establish a prima facie case for the remaining negligence elements—breach, injury, and causation—as well. As for breach, under Colorado law, an actor may be liable for negligence when she "fail[s] to exercise reasonable care." *Lombard v. Colorado Outdoo Educ. Center, Inc.*, 187 P.3d 565, 574 (Colo. 2008). Whether reasonable care has been taken is an objective review "measured by what a person of ordinary prudence would or would not do under the same or similar circumstances." *Id.* (citing *Cubbage v. Leep*, 137 Colo. 286, 289–290, 323 P.2d 1109, 1111 (1958)). Importantly, the amount of care owed depends in part on the attendant circumstances and the apparent risk of the actor's actions or failures to act. *See Summit County Development Corp. v. Bagnoli*, 441 P.2d 658, 664 (Colo. 1968). Here, the operative Complaint paints a plausible picture that Defendant McLaughlin had significant control over the procurement of prescription medication for inmates. Further, Plaintiff plausibly alleges that Defendant McLaughlin was long aware of his need for HIV medication yet failed to take the appropriate steps to procure it—despite Plaintiff's persistent communication—until well into Plaintiff's time at MCDF. In short, Plaintiff's allegations, taken as true, are sufficient to support the claim that Defendant McLaughlin breached her duty of care by inexplicably delaying

the procurement of his HIV medication. *See Garhart ex rel. Tinsman v. Columbia/Healthone, L.L.C.,* 95 P.3d 571, 576–77 (Colo. 2004) (hospital held vicariously liable for a nurse's negligence in delaying to inform obstetrician of observed danger to fetus).

Finally, as to injury, Plaintiff alleges that after over five months without his medication, his T-cell count dropped from over 500 to 283—a number considered "very low"—he had a detectable viral load in his system, and he developed HIV-related sores all over his body. And as to causation, Plaintiff's allegations plausibly show that these health problems were credibly linked—directly and proximately—to his lack of access to the appropriate medication, and, that it should have been reasonably foreseeable to Defendant McLaughlin that her failure to obtain an important cocktail medication could result in harm to Plaintiff.

For these reasons, the Court recommends denying Defendant McLaughlin's motion to dismiss Plaintiff's negligence claim against her insofar as it relates to the delay in obtaining HIV medication on his behalf.[19] Additionally, because Plaintiff has proffered a plausible negligence claim against its employee while she was acting in the scope of her employment, the Court recommends denying Defendant CCS's motion to dismiss the related vicarious liability claim.

## CONCLUSION

**WHEREFORE**, for the foregoing reasons, this court respectfully

**RECOMMENDS** that Plaintiff's Motion to Amend (Doc. No. 186) be **DENIED**. And further

---

[19] For the reasons set out above discussing the deliberate indifference claim against Defendant McLaughlin, Plaintiff has not adequately alleged Defendant McLaughlin's personal participation in the medical care related to Plaintiff's hip condition. For this reason, Plaintiff's negligence claim against Defendant McLaughlin, to the extent it concerns his hip condition, should be dismissed. *See supra* at 37–38.

**RECOMMENDS** that Defendant Lewis's Motion to Dismiss (Doc. No. 160) be **GRANTED** as follows:

1. Defendant Lewis's Motion to Dismiss be granted as to Plaintiff's individual capacity deliberate indifference claim under the Fourteenth Amendment.

2. Defendant Lewis's Motion to Dismiss be granted without prejudice as to Plaintiff's official capacity claim against him.

And further

**RECOMMENDS** that the CCS Defendant's Motion to Dismiss be **GRANTED in part** and **DENIED in part** as follows:

1. Defendant Holmes' Motion to Dismiss be granted as to the claim of deliberate indifference under the Fourteenth Amendment.

2. Defendant Holmes' Motion to Dismiss be granted without prejudice as to the claim of medical negligence.

3. Defendant McLaughlin's Motion to Dismiss be denied on Plaintiff's claims of negligence and deliberate indifference under the Fourteenth Amendment insofar as the claims are related to his HIV medication.

4. Defendant McLaughlin's Motion to Dismiss be granted on Plaintiff's claims of negligence and deliberate indifference under the Fourteenth Amendment insofar as the claims are related to his hip condition.

5. Defendant CCS's Motion to Dismiss be granted without prejudice as to Plaintiff's municipal liability claim under § 1983 and denied as to Plaintiff's vicarious liability claim.

## ADVISEMENT TO THE PARTIES

Within fourteen days after service of a copy of the Recommendation, any party may serve and file written objections to the Magistrate Judge's proposed findings and recommendations with the Clerk of the United States District Court for the District of Colorado. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *In re Griego*, 64 F.3d 580, 583 (10th Cir. 1995). A general objection that does not put the district court on notice of the basis for the objection will not preserve the objection for *de novo* review. "[A] party's objections to the magistrate judge's report and recommendation must be both timely and specific to preserve an issue for de novo review by the district court or for appellate review." *United States v. One Parcel of Real Prop. Known As 2121 East 30th Street, Tulsa, Okla.*, 73 F.3d 1057, 1060 (10th Cir. 1996). Failure to make timely objections may bar *de novo* review by the district judge of the magistrate judge's proposed findings and recommendations and will result in a waiver of the right to appeal from a judgment of the district court based on the proposed findings and recommendations of the magistrate judge. *See Vega v. Suthers*, 195 F.3d 573, 579-80 (10th Cir. 1999) (a district court's decision to review a magistrate judge's recommendation *de novo* despite the lack of an objection does not preclude application of the "firm waiver rule"); *One Parcel of Real Prop.*, 73 F.3d at 1059-60 (a party's objections to the magistrate judge's report and recommendation must be both timely and specific to preserve an issue for *de novo* review by the district court or for appellate review); *Int'l Surplus Lines Ins. Co. v. Wyo. Coal Ref. Sys., Inc.*, 52 F.3d 901, 904 (10th Cir. 1995) (by failing to object to certain portions of the magistrate judge's order, cross-claimant had waived its right to appeal those portions of the ruling); *Ayala v. United States*, 980 F.2d 1342, 1352 (10th Cir. 1992) (by their failure to file objections, plaintiffs waived their right to appeal

the magistrate judge's ruling); *but see, Morales-Fernandez v. INS*, 418 F.3d 1116, 1122 (10th Cir.

2005) (firm waiver rule does not apply when the interests of justice require review).

Dated this 21st day of November, 2022.

BY THE COURT:

_____
Maritza Dominguez Braswell
United States Magistrate Judge